UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LISA ELISARA, Administrator of the Estate of Iosia Faletogo, A.F., a minor individual; R.F., a minor individual;<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF SEATTLE, a municipal corporation; JARED KELLER, an individual; GARRET HAY, an individual; JOHN DOES 1-10;<br><br>Defendants. | NO.<br><br>COMPLAINT FOR DAMAGES<br><br>JURY DEMAND |

## I.  INTRODUCTION

1. This action arises out of the wrongful detention and fatal shooting of Iosia Faletogo by the Seattle Police as he attempted to flee an unlawful traffic stop on the afternoon of December 31, 2018.  Plaintiffs bring claims under the United States Constitution, state common law, and the Washington Public Records Act.

## II.  JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiffs' claims under the Fourth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. §§1983 and 1988, and 28 U.S.C. §§1331,1343, et seq.

COMPLAINT FOR DAMAGES – 1

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E, Suite 250
Seattle, WA   98102
(206) 682-1505   FAX: (206) 467-1823

3. Plaintiffs' state and federal claims arise from a common nucleus of operative facts. Therefore, this court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §1367.

4. Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this district.

5. Assignment to the Seattle Courthouse is proper under LCR 3(d) because a substantial part of the events and omissions giving rise to the claim occurred in King County.

### III. PARTIES

**A.  Plaintiffs and Beneficiaries**

6. Plaintiff Lisa Elisara is the duly appointed and acting Administrator of the Estate of Iosia Faletogo. This appointment was made in King County on February 8, 2019.

7. Iosia Faletogo was an individual who was a resident of Tukwila, King County, Washington. He was pronounced dead on December 31, 2018.

8. Ms. Elisara brings this action in her capacity as Administrator of the Estate and for the benefit of the Estate and all beneficiaries and persons entitled to recovery pursuant to wrongful death, survival, and personal injury laws of the State of Washington, including but not limited to, RCW 4.20.010, 4.20.020, 4.20.046, and 4.20.060, or under any body of foreign law of damages the Court rules applicable to these claims.

9. Plaintiff A.F. is an individual who is a resident of Tukwila, Washington. A.F. is the natural child of Iosia Faletogo and therefore a beneficiary under Washington's wrongful death and survival statutes. A.F. is a minor and therefore referred to by their initials under Fed. R. Civ. P. 5.2.

10. Plaintiff R.F. is an individual who is a resident of Tukwila, Washington. R.F. is the natural child of Iosia Faletogo and therefore a beneficiary under Washington's wrongful death and survival statutes. R.F. is a minor and therefore referred to by their initials under Fed. R. Civ. P. 5.2.

COMPLAINT FOR DAMAGES – 2

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E, Suite 250
Seattle, WA  98102
(206) 682-1505   FAX: (206) 467-1823

**B.     Defendant City of Seattle**

11.     Defendant City of Seattle is a city in King County, Washington.   One of the City of Seattle's Departments is the Seattle Police Department ("SPD").   SPD is responsible for traditional law enforcement activities within the City of Seattle.

**C.     Individual Defendants**

12.     Defendant Jared Keller ("Officer Keller") is an individual who is a resident of Washington State.   At all times material hereto, he was a police officer employed by SPD and was acting within the course and scope of his employment and under color of state law.   This was the second fatal shooting Officer Keller has been involved in.   At some point after this incident, he left SPD and joined the Spokane Police Department.

13.     Defendant Garret Hay ("Officer Hay") is an individual who is a resident of Washington State.   At all times material hereto, he was a police officer employed by SPD and was acting within the course and scope of his employment and under color of state law.

14.     Under the doctrine of respondeat superior, the City of Seattle is liable for the conduct of its employees, including Officer Keller and Officer Hay, which at all relevant times was within the course and scope of their employment.

**D.     General Allegations Regarding Parties**

15.     The true names and identities of "John Doe" Defendants, whether individual, corporate, or otherwise, are unknown to Plaintiffs at this time.   Plaintiffs will amend this complaint to allege the true names and identities of said defendants, and the basis for said Defendants' liability to Plaintiffs, when this information is ascertained.

16.     All pronouns and other indications of gender are meant to be nonspecific and interchangeable.

\\\\\

\\\\\

## IV.  FACTS

**E.    The Stop and Initial Detention**

17.    On December 31, 2018, Officer Keller and Officer Hay followed Iosia Faletogo's car near N. 90th St. and Aurora Ave. N. in Seattle and began looking for a reason to stop him.   Although another officer would later describe Iosia as "shady," it is difficult to determine why they started following Iosia or what the officers believed was amiss.   In lieu of any other explanation about why the car looked "shady," it stands to reason that the officers' attention was captured—either explicitly or implicitly—by the fact that Iosia was a Pacific Islander man riding in a car with a black woman in a predominantly white neighborhood in North Seattle.[1]

18.    After taking note of the vehicle, officers followed Iosia through a parking lot and around a block while running his license plate and looking for pretextual reasons to justify a stop they had already decided they wanted to make.   While running the license plate, the officers discovered that the registered owner of the car had a license suspended in the third degree.[2]   The registered owner of the car was an older woman, who was a family member of Iosia's.

19.    The officers continued following Iosia as he pulled into a mini-mart parking lot and turned their lights on to stop Iosia, who had already opened the door and started getting out of the car.

---

[1] The term concept of "race" is used herein as a cultural, rather than biological, concept. Most modern biologists and anthropologists do not recognize "race" as a biologically valid classification. However, race is commonly used by most Americans to classify people based on subjective and culturally mandated criteria. Because the subjective classifications affect the biases of individuals, the concept is of practical and causal importance to this lawsuit.

[2] Often referred to as "driving while poor," the most common reason for having a license suspended in the third degree is failing to contest or pay traffic tickets.

COMPLAINT FOR DAMAGES – 4

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E, Suite 250
Seattle, WA  98102
(206) 682-1505   FAX: (206) 467-1823

20. Iosia—a man in his 30s—was obviously not the older woman to whom the car is registered. After yelling at Iosia to get back in the car, Officer Hay remarked to Officer Keller: "well, that ain't [the registered owner] is it."

21. Driving a vehicle whose registered owner is suspended is not in itself a crime or infraction. As soon as the officers knew—and acknowledged to each other—that Iosia was not the registered owner of the car, they had no reason to believe he committed any crime or infraction related to driving with a suspended license.

22. At this point, the stop should have been terminated, as the officers had no further reason to detain Iosia. Instead of terminating the stop, however, Officer Keller came up with an alternate reason for the stop, involving an improper lane change.

23. It is unclear whether the officers had fully formulated an opinion as to why the lane change was illegal at this time, but they would later state the lane change was illegal because Iosia crossed multiple lanes at once.

24. Crossing multiple lanes at once—as long as it does not obstruct other traffic—is not a crime or infraction. Accordingly, this alternate reason that the officers gave for the stop was as legally baseless as it was pretextual.

25. Officer Hay spoke with Iosia on the driver side of the car. While doing so, Officer Hay took the car keys and ordered Iosia to stay in the car.

26. Meanwhile, Officer Keller spoke with the passenger on the passenger side of the car. Without any apparent reason to question or detain her, Officer Keller demanded that she show some form of identification. Officer Keller then shined a flashlight in and looked in the back of the vehicle Iosia was driving before returning to the police car with Officer Hay.

27. The officers' intent in prolonging the stop was not to investigate or enforce their mistaken belief that a lane change violation had been committed. Rather, their intent was to detain Iosia and his passenger for the purpose of investigating their unsupported

suspicions of other criminal activity. To effectuate this intent, the officers called for backup. Almost immediately, two other patrol cars with four additional police officers pulled into the parking lot and surrounded Iosia's car.

F. **The Chase and Shooting**

28. Approximately four minutes into the illegal detention, after Officer Hay and Officer Keller returned to the police car, Iosia fled on foot. The six officers saw Iosia attempt to flee and immediately chased him. As Iosia had his back turned and was running in the opposite direction of the Officers, all six Officers immediately started threatening to shoot him.

29. Then Officer Keller and Officer Hay quickly caught and tackled Iosia, piling on top of him as he fell to his hands and knees. Officer Keller immediately took out his handgun and put it to Iosia's temple.

30. The Officers did not know Iosia had a gun until after it fell out of his pocket. At the time of the incident none of the pursing officers had any reason to believe either that Iosia had a gun or that it was illegal for Iosia to have a gun.

31. With a gun at his temple and officers repeatedly yelling that they were going to shoot him, Iosia kept bracing himself as if to crawl forward, in an instinctive but futile attempt to escape. Although Iosia never reached for it, let alone attempted to use it against officers, a handgun fell out of his waistband or pocket during the struggle and landed on the ground.

32. One of the non-party officers repeatedly called for a Taser, but Officer Keller was already attempting to shoot Iosia in the head.

33. The first time he pulled the trigger, Officer Keller's firearm misfired.[3]

34. While Officer Keller's attention was focused on clearing the slide of his firearm, another officer—believed and therefore alleged to be Officer Hay—yelled at Iosia to

---

[3] The weapon's slide was displaced at some point (a condition known as "out of battery"), which is why it did not immediately fire.

not reach for the firearm that was now lying on the ground.   Iosia did not reach for his firearm or make any other intentional movements towards the officers.   As the officers piled on top of him and continued wrestling him towards the ground, Iosia spoke his last words: "Nope, not reaching."

35. Shortly after Iosia declared that he was not reaching for the gun, Officer Keller fatally shot Iosia in the head at close range.

36. EMTs declared Iosia deceased at the scene.

G. **General Allegations Relating to the Traffic Stop**

37. Where a law enforcement officer lacks the legal authority to demand that an individual do something, that individual is not required to blindly cooperate.   In other words, if an officer tells a citizen to dance the citizen need not dance for him.

38. Although it would be nearly another year before the body camera videos of Elijah McClain's strangulation and forced injection of ketamine were released and a year and a half before a video showing the strangulation of George Floyd went viral on Facebook, members of our communities of color have long understood that cooperating with the police does not guarantee one's safety.

39. Where a law enforcement officer illegally uses force or attempts to use force against an individual, that individual is legally entitled to flee or defend themselves from the unlawful application of force.

40. Stopping and then continuing to detain an individual who has committed no crime or infraction is a violation of clearly established constitutional rights.

41. The use of deadly force to detain, seize, or restrain an individual that is attempting to flee—but not using any offensive force—is a violation of clearly established constitutional rights.

42. It is believed and therefore alleged that SPD officers call for backup (also known as an "X-ray" request) more frequently during traffic stops involving suspects that are people of color than stops involving white suspects.

43. It is believed and therefore alleged that Officer Hay and Officer Keller both call for backup more frequently during traffic stops involving suspects that are people of color than stops involving white suspects.

44. Responding more aggressively to traffic stops involving suspects that are people of color is a violation of clearly established constitutional rights.

**H.  Spoliation of Video Evidence**

45. Inexplicably, SPD allowed the in-car video and audio footage immediately preceding the stop to be destroyed.

46. This omission—which violated SPD protocol, the terms of the consent decree involving the Department of Justice and City of Seattle, and basic principles of good policing—means that any record of the conversations between Officer Keller and Officer Hay leading up to the stop are forever lost.

47. The report by SPD's Office of Police Accountability wrote this destruction of evidence off as "documented system failure." This statement is an oversimplification that supports a misleading implication that the nature of the failure was purely technical in nature. In reality, there were two separate problems that allowed relevant footage to be destroyed.

48. The Coban video system used in SPD's vehicles records onto two separate hard drives. When the light bar on a vehicle is activated, footage is saved to a removable hard drive, which is regularly removed from the vehicle and downloaded. The video system is also supposed to be recording at all times and saving footage onto a larger internal hard drive.

49. This first problem related to the removable hard drive involved both technological and human error. When Officer Keller and Officer Hay activated the light bar

to stop Iosia, the footage was not recorded to the removable hard drive due to a malfunction on the power board. This problem started when another officer improperly shut down the system and corrupted the power board. The power board issue could have also been detected by Officer Keller and Officer Hay. Because the power board malfunction started before their shift, a technical check would have revealed the problem and allowed them to remedy the problem before starting their shift.

50. When the light bar is turned on, an easily noticeable green light on the officers' body-worn microphone turns on, and there is also an indication on the computer screen in the car when the video system is recording to the removable hard drive. A proper technical check would consist of flipping the light bar on and verifying these indicia of recording. The prudent practice is for officers to conduct a technical check of their recording equipment at the start of their shift, but Officer Keller and Officer Hay did not conduct a technical check of their recording equipment.

51. The second problem was related to the internal hard drive and was caused entirely by human error. The primary purpose of the internal hard drive is redundancy. Although it is more cumbersome to retrieve the footage, the internal hard drive records at all times in case the removable hard drive fails. However, the internal hard drive is also set to automatically delete footage after a set period of time. SPD failed to save the missing footage before it automatically deleted. They instead put the vehicle (and its internal hard drive with relevant information) back into circulation despite its involvement in a stop leading to a fatal shooting, resulting in the footage being permanently deleted from the internal hard drive.

52. The fact that an officer-involved fatal shooting was not sufficient to preserve evidence leads to the inevitable conclusion that there is no policy or procedure in place to save footage from the internal hard drive. The internal hard drive gives SPD's system the illusion of reliability but the manner in which SPD handles the evidence results in loss of any

of the potential benefits of having the redundant internal hard drive. It is difficult to imagine a more important incident type than a stop leading to a fatal officer-involved shooting. Accordingly, it is reasonable to conclude that SPD's failure to retrieve and preserve the internal hard drive for footage in this case was the result of major flaws in their policies and procedures relating to evidence retention.

I.  **Public Records Request**

53. On or about December 3, 2020, counsel for the Estate made a public records request to the City of Seattle, pursuant to RCW 42.46 et seq., for all records relating to this incident.

54. To date, the City of Seattle has produced no responsive records.

## V.  LIABILITY

### FIRST CLAIM FOR RELIEF
### Civil Rights Claims for Excessive Force
*Against Officer Keller and Officer Hay*

55. The Fourth Amendment to the United States Constitution guaranteed Iosia the right to be secure in his person against unreasonable seizures through the use of excessive force.

56. Officer Keller and Officer Hay did not have a valid legal basis to detain Iosia.

57. Without a valid legal basis to detain Iosia, Officer Keller and Officer Hay also did not have a valid legal basis to use any amount of force against Iosia.

58. The initial stop and detention, repeated physical threats, tackling/restraining, and then fatal shooting violated Iosia's Fourth Amendment rights.

### SECOND CLAIM FOR RELIEF
### Civil Rights Claim for False Arrest/Imprisonment
*Against all Defendants*

59. The Fourth Amendment to the United States Constitution guaranteed Iosia the right to be secure in his person against detention without probable cause or a valid warrant.

60. Officer Keller and Officer Hay violated the Fourth Amendment by stopping and detaining Iosia without probable cause or reasonable suspicion.

### THIRD CLAIM FOR RELIEF
### Civil Rights Claim for Denial of Equal Protection
*Against all Defendants*

61. The Fourteenth Amendment guarantees people of all races equal protection of the law.

62. Iosia's race was a material factor—either intentional or unconscious—in Officer Hay and Officer Keller's decision to seize and then use excessive force against him.

63. There was no rational basis for Officer Hay and Officer Keller's discriminatory actions, let alone a purpose narrowly tailored to serve a compelling government interest.

64. The lack of reasonable suspicion or probable cause along with SPD's history of racially biased policing are evidence that the improper seizure of Iosia was made more likely because of Iosia's race.

65. Accordingly, Officer Hay and Officer Keller violated Iosia's Fourteenth Amendment right by treating him differently than a similarly situated white suspect.

### FOURTH CLAIM FOR RELIEF
### Intentional Torts
*Against all Defendants*

66. Plaintiffs allege intentional tort claims against Officer Hay and Officer Keller for the torts of false arrest, false imprisonment, assault, and battery.

67. Officer Hay and Officer Keller used physical force to tackle and restrain Iosia without probable cause or any other lawful reason and made physical contact with him in a manner that was intentional, nonconsensual, and harmful and/or offensive; and they are therefore liable under state law for these intentional torts.

\\\\\

\\\\\

## FIFTH CLAIM FOR RELIEF
### Common Law Negligence
*Against all Defendants*

68. Plaintiffs allege common law negligence claims against all Defendants. All Defendants had a duty of reasonable care to Iosia, breached that duty, and proximately caused Plaintiffs' damages. Additional allegations regarding individual Defendants are included in the paragraphs below.

69. In addition to and/or in the alternative to the alleged facts supporting Plaintiffs' intentional tort claims, Officer Keller and Officer Hay were negligently indifferent to the traffic code and mistakenly detained Iosia for an infraction that does not exist.

70. In addition to and/or in the alternative to the alleged facts supporting Plaintiffs' intentional tort claims, Officer Keller failed to observe the fact that Iosia stopped resisting and declared that he was not reaching and negligently proceeded to discharge his firearm at close range into the head of a man who was not a threat.

71. SPD negligently failed to institute policies, procedures, and training related to safely conducting investigatory stops, de-escalation techniques, and firearm use.

## SIXTH CLAIM FOR RELIEF
### Civil Rights Claim for Insufficient Policies, Procedures, and Training
*Against the City of Seattle*

72. Defendant City of Seattle is liable under 42 U.S. §1983 for its failure to institute policies, procedures, and training related to safely conducting investigatory stops, de-escalation techniques, and firearm use.

73. Based on a history of unlawful use of force and biased policing—including but not limited to matters addressed by the consent decree between the Department of Justice and the City of Seattle—the City of Seattle is on notice that these deficiencies have and will continue to cause constitutional violations.

74. Plaintiffs have still not been provided with responsive public records requested under the Public Records Act. However, based on the OPA report that SPD published online, it is apparent that SPD management took no issue with the lack of probable cause or reasonable suspicion that an actual crime or infraction occurred, or the manner in which Officer Keller and Officer Hay escalated the situation by calling for backup at an otherwise peaceful traffic stop. This tacit approval supports the conclusion that the officers' conduct is customary within SPD.

## SEVENTH CLAIM FOR RELIEF
### Civil Rights Claim for Deprivation of Familial Relationship
*Against All Defendants*

75. The Fourteenth Amendment guarantees A.F. and R.F. the right to be free from the deprivation of their liberty interests in a familial relationship with their father without due process of law. Such a deprivation occurred under the fact pattern described in this complaint.

## EIGHTH CLAIM FOR RELIEF
### Violation of the Washington Public Record Act
*Against the City of Seattle*

76. Defendant City of Seattle failed to meet its burden to promptly produce all public records requested, in violation of RCW 42.56 *et seq.*

## VI. DAMAGES

77. The above-described actions and omissions proximately caused Plaintiffs' damages, and entitle Plaintiffs to monetary relief including compensatory damages, punitive damages, and attorneys' fees and costs.

78. This action is brought for the wrongful death of Iosia Faletogo, and for the Estate of Iosia Faletogo, and for the losses of all wrongful death beneficiaries pursuant to Washington state law, including damages for mental and physical emotional distress, anguish, anxiety and loss of Iosia's love, care, comfort, society, and companionship and for services

KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Ave E, Suite 250
Seattle, WA 98102
(206) 682-1505 FAX: (206) 467-1823

and support; and for Iosia's general damages including anxiety and fear arising out of the peril to which Iosia was subjected, and Iosia's awareness of his impending death, along with his mental and physical pain and suffering and severe trauma experienced prior to being fatally shot in the head at close range; and for the destruction of Iosia's earning capacity and financial loss to his estate and the beneficiaries; funeral expenses and loss of personal property; and for the losses to his surviving beneficiaries, all pursuant to the Wrongful Death and General and Special Survival Statutes of the State of Washington and any other wrongful death and survival damages available under any other applicable law.

79. This action is brought pursuant to 42 U.S.C. §1983 and §1988, and Plaintiffs are therefore entitled to all compensatory damages, punitive damages, costs, and attorneys' fees allowed under federal and state law.

80. The public records cause of action is brought under RCW 42.56 et seq., so Plaintiffs are entitled to reasonable attorneys' fees and costs in addition to $100 per day for each record improperly withheld, pursuant to RCW 42.56.550(4).

## VII.  JURY DEMAND

81. Plaintiffs hereby request a jury trial in this matter.

## VIII.  COMPLIANCE WITH CLAIM FILING STATUTES

82. Plaintiffs and their counsel have fully complied with RCW Ch. 4.92, as applicable, to bring this action.   More than 60 days have elapsed since filing of the claims, which have not been accepted by the applicable Defendants.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs having stated their cases, pray for judgment against the above-named Defendants, as follows:

A. For special damages in an amount to be proven at the time of trial for loss of support of all beneficiaries of the Estate of Iosia Faletogo occasioned by the wrongful death of

Iosia Faletogo;

B. For special damages for destroyed income and earning capacity of Iosia Faletogo occasioned by his death and the economic loss to his estate caused by his premature death;

C. For general damages for all wrongful death beneficiaries of Iosia Faletogo for loss of love, care, comfort, society, companionship, loss of services and support, and family guidance, past and future;

D. For general damages for the pain and suffering preceding and occasioning the death of Iosia Faletogo, including his knowledge and awareness of impending doom;

E. For the mental distress and grief suffered by Iosia Faletogo's beneficiaries, and for their loss of love, care, comfort, society, companionship, loss of services and support, and family guidance, past and future occasioned by Iosia's death;

F. For funeral and burial expenses;

G. For punitive damages against Defendants sufficient to punish them and to deter further wrongdoing;

H. For all other general and special damages recoverable under Washington state law, or any other law deemed applicable by the Court;

I. For pre- and post-judgment interest;

J. The maximum amount of statutory damages allowed, pursuant to RCW 42.56.550(4);

K. For costs, including reasonable attorneys' fees allowed by law; and

L. For such other further relief as the Court deems just and equitable.

Dated this 4th day of March, 2021.

        KRUTCH LINDELL BINGHAM JONES, PS
        By: /s/ J. Nathan Bingham
           J. Nathan Bingham, WSBA #46325
           Email: jnb@krutchlindell.com

        By: /s/ James T. Anderson
           James T. Anderson, WSBA #40494
           Email: jta@krutchlindell.com

        By: /s/ Matthew C. Clarke
           Matthew C. Clarke, *pro hac vice pending*
           Email: mkc@krutchlindell.com

           3316 Fuhrman Ave E
           Suite 250
           Seattle, Washington 98102
           Telephone: (206) 682-1505
           Facsimile: (206) 467-1823

COMPLAINT FOR DAMAGES – 16

**KRUTCH LINDELL BINGHAM JONES, P.S.**
3316 Fuhrman Ave E, Suite 250
Seattle, WA 98102
(206) 682-1505 FAX: (206) 467-1823